IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PATRICK D. REED, | ) | Case No. 3:21-cv-799 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| LYNEAL WAINWRIGHT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Patrick D. Reed, is serving an aggregate prison sentence of 26 years and 6

months for various drug and firearm-related offenses arising out of a series of controlled buys

between October 2014 and March 2015 and evidence obtained from the execution of two search

warrants issued after the controlled buys.  Reed has petitioned for a writ of habeas corpus, under

28 U.S.C. § 2254, raising four claims for relief.  ECF Doc. 1.  Reed asserts:

> **Ground One**: Reed's convictions were unsupported by, and against the manifest
> weight of, the evidence presented at trial.  ECF Doc. 1 at 5; ECF Doc. 8 at 14–23.
>
> **Ground Two**: Reed's Sixth Amendment right to confront witnesses against him
> was violated when officer witnesses testified to what non-testifying confidential
> informants said.  ECF Doc. 1 at 7; ECF Doc. 8 at 23–35.
>
> **Ground Three**: Reed's Fourteenth Amendment right to due process was violated
> when the trial court consolidated his two cases for trial and denied his motion to
> sever.  ECF Doc. 1 at 8; ECF Doc. 8 at 35–37.
>
> **Ground Four**: The trial court erred when it denied his motions to suppress
> evidence seized pursuant to search warrants which lacked probable cause, and he
> was denied a full and fair hearing on his Fourth Amendment issues on appeal.
> ECF Doc. 1 at 10–11; ECF Doc. 8 at 37–41.

Respondent Warden Harold May filed a return of writ.[1]  ECF Doc. 6.  Reed, through counsel, filed a traverse.

Because Reed's claims are meritless and noncognizable, I recommend that Reed's clams be DENIED in part and DISMISSED in part and that his petition for a writ of habeas corpus be DENIED.  I further recommend that Reed be granted a certificate of appealability, but only with respect to his Ground Two claim, as described in Section III below.

## I.     State Court History

### A.     Trial

On June 10, 2015, an Erie County, Ohio, grand jury returned an indictment charging Reed with: two counts of trafficking in a counterfeit controlled substance (Counts One and Two); one count of trafficking in 0.11 grams of heroin in the vicinity of a juvenile (Count Three); one count of possession of 4.29 grams of heroin (Count Four); one count of possession of 16.70 grams of cocaine (Count Five); one count of preparation of 4.29 grams of heroin for sale (Count Six); one count of preparation of 16.70 grams of cocaine for sale (Count Seven); one count of having a weapon, a "303 Enfield No4 MK1 rifle," while under disability (Count Eight); one count of tampering with evidence by throwing two plastic bags with suspected cocaine and heroin under a table (Count Nine); and one count of failure to verify (Count Ten).  ECF Doc. 6-1 at 7–9.  Reed pleaded not guilty.  6-1 at 12.

On November 30, 2015, Reed filed a motion to suppress all evidence seized pursuant to a search warrant issued on December 11, 2014, because: (i) the warrant failed to establish the reliability of the confidential informants; (ii) the number of controlled buys attempted constituted

---

[1] As the warden of Marion Correctional Institution, where Reed is confined, Harold May is the proper respondent.  *Rumsfeld v. Padilla,* 542 U.S. 426, 435–36 (2004) ("the proper respondent [in a habeas action] is the warden where the [petitioner] is being held").

2

entrapment; and (iii) the was no urgent necessity for a nighttime search warrant.  *See* ECF Doc. 6-1 at 14–20.  Reed attached the search warrant, which authorized the search of Reed's person and a residence located at 206 Townsend St., Sandusky, Ohio 44870 ("Townsend residence").  ECF Doc. 6-1 at 21.  The description of items to be searched and seized included:

> Heroin and other narcotic drugs and/or other paraphernalia used in the taking of drugs and/or preparation of illegal drugs for sale, use, or shipment, records of illegal transaction articles of personal property, papers and documents tending to establish the identity of persons in control of the premises, contraband including but not limited to money, guns, scales, safes, plastic bags, cigarette rolling papers and all other evidence of the violation of the Ohio drug laws, to wit: 2925.03 and 2925.11 of the Ohio Revised Code et seq.

*Id.* (sentence case added).

Reed also attached the search warrant application, the affiant of which was Detective Adam West.  ECF Doc. 6-1 at 23.  Detective West's supporting affidavit asserted that:

1. On October 20, 2014, a confidential informant ("CI-1") met with and advised Detective West and Detective Robert Bess that they could purchase heroin from Reed.  CI-1 arranged to purchase $40 of heroin from Reed in the 200 block of Townsend Street.  The detectives authorized a controlled buy, during which they observed Reed exit the Townsend residence, meet CI-1, and reenter the Townsend residence.  CI-1 then met with the detectives at a predetermined location and turned over suspected heroin.  Subsequent testing was negative for the presence of a controlled substance.

2. On November 3, 2014, CI-1 met with and advised Detective Bess and Detective Jon Huffman that they could purchase heroin from Reed and arranged to purchase $60 of heroin.  The detectives authorized a controlled buy, during which they observed the same interaction as with the first buy.  The CI-1 turned over suspected heroin, the test results of which were still pending.

3. On December 8, 2014, a confidential information ("CI-2") who had never conducted a controlled buy advised Detectives West and Bess that they could purchase heroin from Reed and arranged to purchase $40 of heroin.  The detectives authorized a controlled buy, during which they observed CI-2 drive to, enter, and exit the Townsend residence.  CI-2 turned over suspected heroin, the test results of which were still pending.

3

4.      Both confidential informants wore a digital recorder during the controlled buys.  CI-1 was searched prior to and after his controlled buys.  CI-2's person and vehicle were searched prior to and after the third buy.

5.      Reed's criminal history included convictions for drug abuse in 2002, possession of drugs in 2007, assault in 2011, and trafficking in cocaine in 2013.

ECF Doc. 6-1 at 24–25.

The state filed a response in opposition, and Reed filed a supplemental memorandum. ECF Doc. 6-1 at 26–44.  On February 11, 2016, the trial court held an evidentiary hearing and received testimony from Detective West.  ECF Doc. 6-2.  On February 19, 2016, the court denied Reed's motion to suppress.  ECF Doc. 6-1 at 45.

On June 9, 2016, a separate Erie County grand jury returned an indictment charging Reed with: one count of complicity to commit trafficking in 0.76 grams of heroin with Candace Wilson (Count One); one count of possession of 42.04 grams of heroin (Count Two); one count of preparation of 42.04 grams of heroin for sale in the vicinity of a juvenile (Count Three); one count of possession of less than 0.10 grams of cocaine (Count Four); one count of aggravated possession of 4.14 grams of fentanyl (Count Five); and two counts of having a weapon – a "Glock 27" and "Ruger LC9" – while under disability (Counts Six and Seven).  ECF Doc. 6-1 at 46–49.

On August 3, 2016, the state moved to consolidate Reed's two criminal cases for purposes of trial.  ECF Doc. 6-1 at 51–52.  Reed filed a memorandum in opposition, arguing that: (i) consolidation would allow the admission of other acts evidence that would be inadmissible if the cases were tried separately, such as those relevant to Counts Six and Seven of the second indictment; (ii) consolidation would allow the accumulation of evidence, the probative value of which was outweighed by its prejudicial effect; and (iii) nothing connected the

4

two cases.  EC Doc. 6-1 at 53–56.  The trial court summarily granted the state's motion for

consolidation.  ECF Doc. 6-1 at 57–58.

On September 23, 2016, Reed filed a motion to suppress evidence seized pursuant to a

search warrant issued on March 15, 2016, because: (i) the warrant was based in part on stale

information; (ii) the warrant failed to establish the reliability of the confidential informants;

(iii) the affiant had no personal knowledge of whom the confidential informants communicated

with or purchased drugs from; (iv) the affiant had no personal knowledge of whether drugs were

present inside the residence where the controlled buys took place; and (v) the warrant failed to

satisfy Ohio's requirements for a "no knock warrant."  *See* ECF Doc. 6-1 at 59–67.  Reed

attached the search warrant, which authorized the search of Reed's person and a residence

located at 1201 W. Larchmont Dr., Sandusky, Ohio 44870 ("Larchmont residence").  ECF Doc.

6-1 at 68.  The description of items to be searched and seized included:

> Heroin, crack cocaine and other narcotic drugs and/or other paraphernalia used in
> the taking of drugs and/or preparation of illegal drugs for sale, use, or shipment,
> records of illegal transaction, articles of personal property, papers and documents
> tending to establish the identity of persons in control of the premises, contraband
> including but not limited to money, guns, scales, safes, plastic bags, cigarette
> rolling papers and all other evidence of the violation of the Ohio drug laws, to wit:
> 2925.03 and 2925.11 of the Ohio Revised Code et seq.

*Id.* (sentence case added).

Reed also attached the affidavit in support of the search warrant application, executed by

Detective Ronald Brotherton III.  ECF Doc. 6-1 at 73.  Detective Brotherton's affidavit described

the controlled buys conducted by CI-1 and CI-2, adding that only CI-2's buy yielded a substance

that tested positive for the presence of heroin.  ECF Doc. 6-1 at 74–75.  The affidavit also

described Reed's prior convictions.  ECF Doc. 6-1 at 80.  Detective Brotherton further asserted

that:

1. On February 18, 2016, a confidential informant ("CI-3") with no prior controlled buy experience met with and advised Detective Brotherton and Sergeant Ronald Snyder that they could purchase crack cocaine from Reed.  CI-3 called "Bunny," which Detective Brotherton knew to be Reed's nickname, asked to purchase $40 of crack cocaine, and was told that Reed was on Neil Street.  The officers authorized a controlled buy, during which they observed CI-3 walk north of a residence located on 125 Neil St. and heard CI-3 speak with a male and walk away from the residence.  CI-3 met with the officers at a predetermined location and turned over suspected crack cocaine, the test results of which were still pending.  CI-3 also stated that he had met with Reed inside an apartment, he had a brief conversation with Reed before leaving, and that a small child was present.

2. On March 2, 2016, CI-3 met with and advised Detective Brotherton and Lieutenant Danny Lewis that they could purchase crack cocaine from Reed.  CI-3 contacted Reed at the same phone number as before, and Reed responded that he'd call back.  Reed then called back from a new phone number, asked CI-3 to contact him at the new number going forward, and informed CI-3 that he was on Neil Street.  The officers authorized a controlled buy, during which they observed and heard the same interactions as the previous buy.  CI-3 turned over suspected crack cocaine, the test results of which were still pending.

3. On March 3, 2016, Detective Joe Rotuno asked to assist Detective Brotherton with a controlled buy, because a proven confidential informant ("CI-4") advised that they could purchase crack cocaine from a female who "runs dope" for Reed.  CI-4 contacted the female, who asked to be picked up and taken to Larchmont Drive.  The officers authorized a controlled buy.  And Detective Brotherton, Officer Snyder, and Detective Jonah Roesch observed the female exit CI-4's vehicle, walk through backyards towards Larchmont Drive, enter and exit the Larchmont residence, and get back in CI-4's vehicle.  The Larchmont residence was a place from where Detective Brotherton knew Reed sold drugs.  CI-4 later turned over suspected crack cocaine, the tests results of which were still pending.

4. On March 8, 2016, CI-4 met with and advised Detective Rotuno and Officer Jacob Marsinick that they could purchase crack cocaine from Reed through the same female as the previous controlled buy.  The officers authorized a controlled buy, during which they observed the female enter and exit the Larchmont address.  The officers intercepted CI-4 and the female and obtained from the female a paper tissue that had a "foil bindle" of suspected crack cocaine inside, the test results of which were still pending.

5.      Also on March 8, 2016, a confidential informant ("CI-5") who had no prior controlled buy experience met with and advised Detective Brotherton and Officer Snyder that they could purchase heroin from Reed. CI-5 called Reed at Reed's new phone number and arranged to purchase drugs. The officers authorized a controlled buy, during which they observed CI-5 enter and exit the rear of the Larchmont address and overheard CI-5 speak with Reed. CI-5 turned over suspected heroin, the results of which were still pending. CI-5 also stated that, while inside the Larchmont residence, she was told to wait in the living room while Reed went to another room. After Reed returned, CI-5 exchanged the buy money for suspected heroin.

6.      On March 9, 2016, CI-5 met with and advised Detectives Brotherton and West that they could buy heroin from Reed. CI-5 called Reed and set up the deal. The officers authorized a controlled buy, during which they observed CI-5 engage in the same conduct as the previous controlled buy. CI-5 turned over suspected heroin, the results of which were still pending. CI-5 also stated that Reed's grandmother let her inside the residence, CI-5 was told to wait in the living room while Reed went to another room, and CI-5 met Reed again in the kitchen, where Reed put the suspected heroin on a digital scale. CI-5 advised "they have seen Reed keep his narcotics in a green bean can" and that "Reed cut the top of the can and that was how he concealed his narcotics."

7.      On March 15, 2016, CI-5 met with and advised Detectives Brotherton and Huffman that they could purchase heroin from Reed. CI-5 contacted Reed at his new phone number to set up the deal. The officers authorized a controlled buy, during which Detectives Rotuno and Roesch observed CI-5 enter and exit the Larchmont residence. CI-5 then turned over suspected heroin, the test results of which were still pending. CI-5 also stated that Reed "had two (2) other types of Heroin for different prices."

8.      The confidential informants all wore digital recorders. They were all searched prior to and after the controlled buys. This included CI-4's vehicle but not the female from whom CI-4 obtained suspected crack cocaine.

ECF Doc. 6-1 at 75–80.

        The state filed a response. ECF Doc. 6-1 at 83–96. On October 31 and December 15, 2016, the trial court held evidentiary hearings on Reed's motion and received testimony from Detectives Brotherton and Rotuno. ECF Doc. 6-3; ECF Doc. 6-4. On January 3, 2017, Reed filed a supplemental memorandum. ECF Doc. 6-1 at 97–101. On January 6, 2017, the court

denied Reed's second motion to suppress.  ECF Doc. 6-1 at 102.  And on January 29, 2018, the

court severed Count Ten of the first indictment from the remaining charges.  ECF Doc. 6-1 at

206, 227.

On January 23, 2018, Reed's case proceeded to trial.  ECF Doc. 6-5 at 25.  At the onset,

Reed moved to sever his two cases.  ECF Doc. 6-5 at 46–47; *see also* ECF Doc. 6-11 at 138–41

(renewed motion).  The trial court affirmed its prior ruling.  ECF Doc. 6-5 at 47; *see also* ECF

Doc. 6-11 at 142.  Reed also renewed his motions to suppress, which the court denied.  ECF

Doc. 6-6 at 136–40.

The evidence presented at trial, as described by the Ohio Court of Appeals, was as

follows:

> {¶ 5} . . . The state presented the testimony of several officers regarding
> multiple controlled drug purchases involving [Reed].  Officers testified about the
> general protocol in conducting controlled drug buys.  This included making sure
> the CI was not intoxicated and making sure the CI did not have any drugs, money,
> or contraband on their person or in their vehicle if it would be used to facilitate
> the transaction.  The transaction was recorded by a device worn by the CI and the
> money used was photographed.  Following the buy, the CI was again searched.

> {¶ 6} Sandusky Police Department Officer Adam West provided much of the
> testimony regarding the first three controlled drug purchases.  The first controlled
> buy took place on October 14, 2014, and involved CI-1.  CI-1 called [Reed] and
> arranged a heroin purchase.  They met in front of [Reed's] home on Townsend
> Street in Sandusky, Ohio.  The material purchased was tested and no controlled
> substance was detected.  An audio recording of the transaction was played for the
> jury.

> {¶ 7} A second controlled drug purchase involving CI-1 was completed on
> November 3, 2014.  Sandusky Police Detective Jonathon Huffman testified that
> they met and searched CI-1, set up the digital recorder, and provided him with the
> photocopied buy money.  The CI then walked to [Reed's] home on Townsend
> Street.  Officer Huffman stated that CI-1 met [Reed] on the sidewalk in front of
> the residence; money and purported drugs were exchanged.  Ultimately, the
> substance recovered was determined not to be a controlled substance.  Detective
> Huffman also testified as to the weapons seized pursuant to the search warrants
> and their operability.

{¶ 8} Officer West testified that CI-2, who was cooperating with police in lieu of a criminal charge, indicated that [Reed] was an individual from whom she had purchased drugs. On December 8, 2014, CI-2 telephoned an individual she called "Bunny" to arrange a heroin purchase. A recording of the call was played for the jury. CI-2 then drove her vehicle to [Reed's] residence on Townsend, entered the residence, returned to her vehicle and drove to meet officers. The substance CI-2 purchased was tested and found to contain .11 grams of heroin. A recording of the transaction was played for the jury.

{¶ 9} Based on these transactions, police applied for and were granted a search warrant which was executed on December 11, 2014, and included [Reed's] person and his residence on Townsend Street. Prior to entering the home, police conducted surveillance and observed several cars parked nearby. Individuals would exit a vehicle, enter the targeted location, and leave within one to two minutes.

{¶ 10} Officers then knocked and announced the search warrant; upon observing individuals trying to leave through the back of the residence, they used a battering ram to breach the door. [Reed] was observed running toward the rear of the house; he threw plastic bags containing unknown substances and money under the dining room table. Multiple cell phones and a digital scale were recovered from the house. [Reed's] social security card and a rifle were recovered from underneath a bed; in the same room men's clothing, personal photographs, money, and paperwork with [Reed's] name were found. The recovered substances were tested and were identified as heroin and cocaine.

{¶ 11} Sandusky Police Officer Michael Schock testified that during the execution of the warrant he searched the bedroom on the south side of the residence. He discovered a rifle under the bed. [Reed] informed the officer that the rifle was a British sniper rifle. Photographs of the seized items were admitted into evidence.

{¶ 12} The second round of controlled drug buys commenced in 2016. The March 8, 2016 controlled buy involved the Perkins Police Department. Officer Joe Rotuno testified that CI-[4] was cooperating with the controlled buy in order to avoid prosecution on a drug possession charge. CI-[4] had been used previously in controlled drug transactions. CI-[4] indicated that she could purchase drugs through another female who would get the drugs from "Bunny."

{¶ 13} After the proper protocols and procedures, CI-[4] was followed in her vehicle to pick up the female and they drove to [Reed's] new address on Larchmont Drive in Sandusky, Ohio. The female went into the residence, left the residence and got back into CI-[4]'s vehicle. Detective Rotuno stated that they approached the vehicle at a drive-through carry-out; the female was found with drugs in her crotch area. They were tested and determined to be .76 grams of heroin. The digital recording of the transaction was played for the jury.

{¶ 14} Detective Rotuno then testified regarding the execution of the search warrant at the Larchmont address on March 15, 2016.  Rotuno stated that on that date they were conducting surveillance in aid of another agency's controlled buy at the Larchmont address.  Following the transaction, multiple officers entered and cleared the residence.  During the initial search officers found a receipt for a nearby motel; they proceeded to the motel to see if they could locate [Reed].  The motel clerk confirmed that [Reed] was staying at the motel.  Eventually, [Reed] exited the room and he was placed under arrest based on the discovery of at least one firearm at his residence.  Three cell phones and cash were found on [Reed].

{¶ 15} Detective Ron Brotherton, a narcotics detective with the Sandusky Police Department, testified regarding the March 8, 2016 controlled drug buy involving [Reed].  Brotherton stated that he was conducted by Officer Rotuno to assist with surveillance.  Following the transaction, Officer Brotherton stated that he participated in the "buy bust" involving CI-[4] and the middlemen who had placed the narcotics down the front of her pants.

{¶ 16} Officer Brotherton testified that he was the affiant on the search warrant that was issued and executed on March 15, 2016.  On that date, prior to the search, CI-5 purchased drugs from [Reed] outside of his residence on Larchmont; the CI-5 indicated that [Reed] then returned to the residence. Brotherton stated that two individuals in a green Ford Ranger were seen leaving the residence.

{¶ 17} Similar to Officer Rotuno's testimony, Officer Brotherton stated that they then executed the search warrant by a knock-and-announce at the back door. [Reed's] grandmother was in the residence.  Brotherton stated that they quickly discovered a hotel receipt; officers proceeded to the hotel in an attempt to locate [Reed] since his person was included in the search warrant.  [Reed] was located and transported back to the residence so he could be present for the remainder of the search.  Two firearms were found in a bedroom.  [Reed's] juvenile son, who also resided in the residence, came home during the search.

{¶ 18} Officer Brotherton identified several photographs taken during the search which included photographs of two firearms and ammunition, a digital scale, clothing that was [Reed's] size, mail addressed to [Reed], multiple cell phones, and nearly $4,000 cash all located in the southeast bedroom.  An additional digital scale was found in the kitchen.  A coffee mug containing suspected narcotics was found in the roof gutter; police were tipped that [Reed] hid drugs in that location.

{¶ 19} Officer Brotherton testified that none of the money found was marked buy money.  He stated that drug traffickers know that the money is marked and will try to use or exchange it as quickly as possible.  Officer Brotherton further

10

testified that [Reed] was released from the Erie County Jail and arrested two days later at the Larchmont address.

{¶ 20} [Reed] cross-examined the officers involved in the controlled buys and execution of the search warrants. Officer Adam West admitted that he did not know who, in addition to [Reed], lived at the home on Townsend. He stated that he had never been in the home prior to the execution of the search warrant and did not know which bedroom was [Reed's]. Officer West clarified that he concluded the room was [Reed's] because men's clothing was found with his identification in it. West was questioned about testimony in the prior suppression hearing which conflicted with his trial testimony. Officer West agreed that he previously stated that he did not observe a hand-to-hand transaction between [Reed] and CI-1. West admitted that a confidential informant could hide drugs and/or money on their person and fabricate evidence. West also admitted that he was not present when CI-1 purportedly called [Reed] to arrange the drug transaction. As to CI-2, Officer West was questioned as to the thoroughness of the search of her person and vehicle.

{¶ 21} Officer Rotuno was questioned about the execution of the search warrant; he admitted that he had never been inside the Larchmont location and did not personally know who owned the house. Rotuno also admitted that he had never seen [Reed] sell drugs to anyone.

{¶ 22} Officer Rotuno was also questioned about the March 8, 2016 controlled drug buy involving CI-[4]. Rotuno admitted that he did not have continuous visual surveillance of either the CI or the female go-between who actually purchased the drugs.

{¶ 23} Officer Ron Brotherton admitted that there was no scientific evidence to confirm [Reed] had physically handled any of the items seized during the March 15, 2016 execution of the search warrant. Brotherton also admitted that he did not know who slept in the southeast bedroom the night before the search.

{¶ 24} Sandusky Police Officer Lucas Rospert testified regarding the body camera video he wore during the execution of the March 15, 2016 search warrant. The video was played for the jury. Officer Rospert admitted that when police entered the back door they did not see what was occurring in the front of the house.

{¶ 25} CI-2 testified that in 2014, she frequently purchased drugs from [Reed], known by the nickname "Bunny." She stated that in December 2014, she was working with police in order to avoid a possession of drugs charge. On December 8, 2014, she contacted [Reed] to arrange a drug purchase; she drove her vehicle to the Townsend Street address, parked and entered the home. Inside, there was a child under the age of five. CI-2 stated that she gave [Reed] the

11

money and he gave her the drugs.  She then drove in her vehicle to meet the detectives.

{¶ 26} During cross-examination, CI-2 admitted that at the time of the controlled buy she was addicted to heroin.  She would lie, steal and prostitute herself in order to obtain heroin.  She also admitted that she would have done just about anything to stay out of jail and keep using heroin and that she had used heroin on the date of the controlled buy.

{¶ 27} CI-4 testified that she had known [Reed], nicknamed Bunny, since 2007, and had purchased drugs from him prior to her imprisonment in 2009.  In March 2016, she began working with police because she had "charges" and had a vendetta against drug-supplier Candace Wilson.  On March 8, 2016, CI-4 met with police to set up the buy and then drove to pick up Wilson.  Wilson directed her to a drop off point; she then exited the vehicle and began walking.  According to CI-4, Wilson was concerned that she was being followed.  When she returned to the vehicle she had heroin for the CI.  On the way back to Wilson's apartment, Wilson had the CI stop at a drive-thru.  Police intercepted them and retrieved the drugs from Wilson's pants.  During cross-examination, CI-4 admitted that Wilson had not been searched for drugs.

{¶ 28} Bureau of Criminal Investigations ("BCI") forensic scientist Samuel Fortener initially acknowledged that he was disciplined by the BCI for failing to follow the proper testing procedures.  Fortener agreed that none of the potentially affected samples were related to [Reed's] case and that he regained the full confidence of the BCI.

{¶ 29} Fortener testified that he received a sample of a substance recovered from the December 8, 2014 controlled buy.  The results were that it was not a controlled substance.  Fortener also tested substances found in bags during the execution of the December 11, 2014 search warrant at [Reed's] residence on Townsend.  One of the bags tested positive for 4.29 grams of heroin, and one for 16.70 grams of cocaine.

{¶ 30} As to the 2016 test results stemming from controlled buys and the execution of the second search warrant, Fortener testified that the substances were tested by another scientist and that he retested them so he could provide testimony in court.  The substance was determined to be .76 grams of heroin.  Several substances were recovered following the execution of the search warrant.  Those tested came back as a digital scale with heroin residue, a digital scale with traces of heroin and THC, four baggies containing amounts of heroin ranging from 27.07 grams to .13 grams, and one baggie with less than .1 grams of cocaine.  Fentanyl was also found in one of the heroin samples.  The original BCI tester, Sara Tipton, also testified as to the results.

{¶31} Larry Rentz, also from the BCI, testified that he analyzed a sample collected on October 20, 2014, and that no controlled substance was found. Rentz also analyzed a sample collected on November 3, 2014, which also contained no controlled substance.

\* \* \*

{¶ 33} [Reed] stipulated to the prior felony convictions rendering him unable to possess a firearm. \* \* \*

{¶ 34} [Reed] presented the testimony of Sandusky Police Chief John Orzech who explained the department's confidential informant policy. The written policy, seven to nine pages long, included sections on what informants are prohibited from doing while working with police. Chief Orzech agreed that the policy prohibits informants from violating any laws while assisting police; this would include the use of narcotics. Orzech stated that an officer would have to have knowledge of the usage to terminate the informant relationship. Chief Orzech agreed that informants were not to be on probation or parole.

{¶ 35} Monique W. testified that on March 15, 2016, she resided at the residence on Larchmont Drive which was the subject of the search. Monique stated that she lived there with [Reed's] mother, his sister and her children, and Detaureis Reed. Monique stated that [Reed] "came through" but that he did not live there. Monique also testified that the Glock and Ruger handguns recovered during the search were hers and that she had a concealed carry permit. Monique testified to a trial exhibit depicting her cell phone's "notes" application in which she had created a note, predating the March 2016 search, with the make and serial number of the handguns.

{¶ 36} During cross-examination, Monique admitted that she never contacted police to ask about her guns. She further admitted that when contacted by police as a potential trial witness she never inquired about the guns. Monique stated that she did not leave the guns the way they were found; unsecured, fully loaded, and under a bed. Monique then backtracked and said that she did store them that way but that it was safe because there were no children in the room.

{¶ 37} Monique testified that she had previously lived at the Townsend Street address with many of the same individuals. She agreed that [Reed] stayed there many times.

ECF Doc. 6-1 at 429–39.[2]

---

[2] These factual findings are presumed correct unless Reed rebuts them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Ohio Court of Appeals' description of the evidence presented at trial has been modified to reflect that several statements the court attributed to "CI-5" were actually made by "CI-4." *See* ECF Doc. 6-7 at 52–55 (testimony that the confidential informant used on March 8, 2016 was Alischia Fluty, who stated that she could obtain drugs from Reed via Candace Wilson); ECF Doc. 6-

The jury found Reed guilty on all counts tried, from both indictments.  ECF Doc. 6-1 at 236–49; ECF Doc. 6-13 at 173–79.  The trial court dismissed Count Ten of the first indictment at the request of the state.  ECF Doc. 6-1 at 250.

On the first indictment, the trial court ordered Reed to serve an aggregate prison sentence of 11 years and 3 months.  ECF Doc. 6-1 at 267.  On the second indictment, the court ordered him to serve an aggregate prison sentence of 16 years.  ECF Doc. 6-1 at 275.  The aggregate sentences from each case were ordered to be served consecutively, making the total aggregate sentence 27 years and 3 months, of which 14 years was mandatory time.  ECF Doc. 6-1 at 267.

## B.    Direct Appeal

On April 11, 2018, Reed timely appealed the trial court's judgment in each of his cases, and the appeals were consolidated.  ECF Doc. 6-1 at 277, 286, 299.  Reed asserted five assignments of error: (i-ii) the trial court erred in denying his motions to suppress; (iii) Reed's confrontation rights were violated by officer witness testimony of what nontestifying confidential informants and other sources said; (iv) Reed's convictions were unsupported by and against the manifest weight of the evidence; and (v) Reed's due process rights were violated by the joinder of his two cases.  ECF Doc. 6-1 at 307.

Generally, Reed's suppression-related assignments of error argued that there was no probable cause for the issuance of search warrants to search his person, the Townsend residence, or the Larchmont residence for heroin, narcotics, firearms, and any violation of Ohio's drug laws.  Reed argued that: (i) the search warrant affidavits failed to establish the reliability of the informants; (ii) the search warrant affidavits failed to establish the confidential informants' and

---

7 at 103–04 (testimony that Wilson flipped to serve as a confidential informant on the March 15, 2016 controlled buy); ECF Doc. 6-10 at 72–78, 82–85 (testimony that on March 8, 2016 Fluty drove Wilson to the Larchmont residence to effectuate a controlled buy).

affiants' basis of knowledge that Reed was the individual from who drugs could be purchased, that Reed was the person with whom the confidential informants interacted, or that Reed in fact provided suspected drugs to the affiants; (iii) the warrants relied in part on stale information (his convictions and on controlled buys not relevant in time to the warrant application); and (iv) the warrants were overbroad.  *See* ECF Doc. 6-1 at 312–31.

Reed's third assignment of error argued that his confrontation rights were violated when: (i) Detectives West and Huffman testified to CI-1's out-of-court statements regarding the first and second controlled buys; (ii) the state was permitted to play the recording of the March 8, 2016 controlled buy, and Detective Rotuno gave testimony interpreting CI-4's statements; (iii) Detective Brotherton testified to what Wilson said after the controlled buy; (iv) Detective Brotherton testified that, according to an anonymous tip, Reed concealed narcotics at different locations; (v) Detective Rotuno testified that he learned of Reed's nickname from Leslie Shepard, another confidential informant; (vi) and Detective Brotherton testified about which bedroom belonged to Reed, about Reed's seeming paranoia, and about Detective Brotherton's knowledge that drug sales were known to take place at the Larchmont residence.  *See* ECF Doc. 6-1 at 332–40.

Reed's sufficiency and manifest weight assignment of error argued, with respect to the first indictment, that there was no evidence that: (i) Reed offered to sell CI-1 heroin; (ii) Reed possessed the cocaine and heroin found at the Townsend residence or that he prepared them for sale; and (iii) Reed in fact possessed the antique rifle.  *See* ECF Doc. 6-1 at 341–44, 347–48. Reed also argued that tossing plastic baggies in plain sight of the officers executing the search warrant did not constitute tampering with evidence.  ECF Doc. 6-1 at 346–47.  With respect to the second indictment, Reed argued that: (i) other than hearsay, there was no evidence that Reed

possessed the drugs found on the garage roof; (ii) other than the presence of guns in a room he sometimes slept in, there was no evidence that Reed possessed the handguns found in the Larchmont residence; and (iii) Reed could not have been complicit in the sale of heroin to Wilson, given that Wilson was not searched before the controlled buy, the controlled buy was for crack cocaine and not heroin, and CI-4 was an unreliable confidential informant.  ECF Doc. 6-1 at 348–52.

Reed's improper joinder assignment of error argued that the trial court erred in denying his motion to sever, because: (i) the facts of each case were two years apart; (ii) the drug trafficking charges involved unrelated buyers of different substances; (iii) the drugs and firearms related to each case were found under different circumstances; and (vi) Reed's guilt turned on evidence which would have inadmissible had the cases been tried separately.  ECF Doc. 6-1 at 352–53.

The state filed an appellee brief, and Reed filed a reply brief.  ECF Doc. 6-1 at 371–426. On January 17, 2020, the Ohio Court of Appeals overruled in part and sustained in part Reed's assignments of error, reversing Reed's convictions on Counts One and Two of the first indictment.  ECF Doc. 6-1 at 427–54; *see also State v. Reed*, 2020-Ohio-138 (Ohio Ct. App. 2020).  With respect to Reed's suppression-related assignments of error, the court stated:

> {¶ 48} [Reed] argues that even as described, the facts in the affidavits did not give rise to probable cause, but instead only supported a "hunch" that drug deals may have been occurring. [Reed] relies on a case from this district where we concluded that a search warrant based upon a confidential informant's statement that a defendant would be leaving the house with drugs, without any indication of the source of the statement, was not sufficient to support a probable cause finding. *State v. Young*, . . . 2015-Ohio-395, ¶48.  [Reed] asserts that the basis of knowledge of the CIs was undisclosed and that the only tested substance was non-controlled.

> {¶ 49} Reviewing *Young*, we find that the facts of this case are distinguishable.  Here, the affidavits were not based on the mere statement that

16

[Reed] was selling drugs.  Controlled buys and surveillance were conducted in both cases.  Further, the affidavits in both cases were issued shortly following a controlled buy, thereby increasing the likelihood that drugs or evidence of drug trafficking would be found at the homes.  * * *

{¶ 50} Mindful of our deferential standard of review, we find that the judge issuing the search warrants in this case had a substantial basis for concluding that probable cause existed supporting the search warrants.  [Reed's] first and second assignments of error are not well-taken.

ECF Doc. 6-1 at 444 (internal citation omitted).

With respect to Reed's sufficiency and manifest weight assignment of error, the Ohio

Court of Appeals stated:

{¶ 65} In the present case we must conclude that the state failed to prove that [Reed] knew that the packages of drugs he sold CI-1 were counterfeit.  There is no evidence that he admitted knowledge or that he packaged the drugs.  Thus, we find that evidence is not sufficient to support the convictions for trafficking in a controlled counterfeit substance.

{¶ 66} As to drug trafficking, preparation, and possession, the statutes required that the state prove that [Reed] sold a controlled substance for money.  The evidence presented at trial demonstrated that [Reed] lived at both the Townsend and Larchmont residences during the relevant times and that digital scales were found in his bedroom as well as various narcotics, cell phones, cash, and weapons.  During the execution of the Townsend search warrant, [Reed] threw baggies with narcotics under the dining room table (tampering with evidence.)  Further, there is sufficient evidence to demonstrate that [Reed] sold the CI drugs in the presence of a juvenile.  There is also sufficient evidence that [Reed] constructively possessed the narcotics found in a cup on the roof of the garage.

{¶ 67} In order to constructively possess contraband, exclusive access to the item need not be established. . . . Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession. . . . The state must also show that the defendant was conscious of the object's presence. . . . Both dominion and control, and whether a person was conscious of the object's presence may be established through circumstantial evidence.  * * *

{¶ 68} As to consciousness of the presence of the narcotics, Officer Brotherton stated that [Reed's] demeanor markedly changed from "cocky and confident" to concern when he realized that a fire ladder was called and police were going to look on the roof of the garage.  Further, the search warrant at

17

Larchmont was executed while [Reed] was under indictment on charges following the execution of the Townsend search warrant and was based on several additional controlled drug buys, thus evidencing [Reed's] ongoing drug trafficking operation.

{¶ 69} The weapons while under a disability charges were based on the recovery of an antique rifle on Townsend and two handguns on Larchmont. There was sufficient evidence to demonstrate that the weapons were [Reed's] based on statements by [Reed] and where the guns were located and the convictions were not against the weight of the evidence even considering the testimony of Monique W. that the handguns were hers.

{¶ 70} Based on the foregoing, we find that [Reed's] fourth assignment of error is well-taken, in part.  [Reed's] convictions for trafficking in controlled counterfeit substance are vacated.

ECF Doc. 6-1 at 450–51 (internal citations and quotation marks omitted).

With respect to Reed's confrontation assignment of error, the Ohio Court of Appeals

stated:

{¶ 54} First, [Reed] contends that CI-1's statements to police surrounding the controlled drug buys were impermissibly elicited through the testimony of Officers West and Huffman.  We note that CI-1 was subpoenaed to testify at trial on multiple occasions due to several trial continuances.  On January 31, 2018, a material witness warrant was issued due to the inability to locate CI-1.  The warrant ordered that he be kept in custody through his tenure as a witness.  CI-1 was not located prior to trial and was unavailable. * * *

{¶ 55} Further, drug buy tapes that are played for the jury are generally not considered hearsay as they are used to provide context as to the activity taking place. . . . Thus, any Confrontation Clause claims stemming from the playing of the recording is unavailing.

* * *

{¶ 58} As to statements made by Wilson to CI-4, the statements fit within the party-opponent exception in that Wilson was indicted on charges.  CI-4 testified at trial and was subject to cross-examination.  Further, police surveilled the transactions and found drugs hidden on Wilson's person.  In addition, police were able to listen to a telephone conversation between CI-4, [Reed] and Wilson and made by Wilson while she was in [Reed's] house.

{¶ 59} Finally, [Reed] contends that he was prejudiced by the improper admission of testimony regarding a tip from an anonymous informant that he

18

concealed drugs in a "green bean can" or in the garage or the roof of the garage. Officer Brotherton testified that based on this information they accessed the roof where heroin, cocaine, and fentanyl were found in a coffee mug.  Following [Reed's] counsel's objection, the court instructed the jury that the testimony was to be considered only to explain what the officer did during the investigation. Presuming that the jury followed the court's instructions, we find no error.

{¶ 60} Based on the foregoing, we find that [Reed's] right to confront witnesses testifying against him was not violated.  [Reed's] third assignment of error is not well-taken.

ECF Doc. 6-1 at 446–47 (internal citations omitted).

As to Reed's improper joinder assignment of error, the Ohio Court of Appeals stated:

{¶ 77} Reviewing the arguments of the parties, we find that [Reed] has failed to affirmatively demonstrate prejudice stemming from the joinder of the cases. Each case was based on the execution of a separate search warrant at a separate residence.  The charges involved various confidential informants and law enforcement and the testimony at trial was segregated as to the multiple controlled purchases and searches.  Further, the charges were all based on a course of criminal conduct, drug trafficking, engaged in by [Reed].  Accordingly, we find that the trial court did not abuse its discretion when it allowed the cases to be joined for trial.  [Reed's] fifth assignment of error is not well-taken.

ECF Doc. 6-1 at 453.

On May 12, 2020, the Ohio Supreme Court granted Reed leave to file a delayed appeal.

ECF Doc. 6-1 at 543.  Reed asserted four propositions of law, which largely encapsulated the

arguments in the five assignments of error of his Ohio Court of Appeals brief.  *See* ECF Doc. 6-1

at 544–63.  The state filed a response.  ECF Doc. 6-1 at 564–81.  On August 18, 2020, the Ohio

Supreme Court declined to exercise jurisdiction.  ECF Doc. 6-1 at 582.

**C.    Remand**

On February 24, 2020, the trial court vacated Reed's convictions on Count One and

Count Two of the first indictment.  ECF Doc. 6-1 at 583.

## II.        Law and Analysis

Because the Ohio Court of Appeals reviewed Reed's claims for relief on the merits, its decision denying relief is subject to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, a writ of habeas corpus can issue only if the state court decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the record before the state court.  28 U.S.C. § 2254(d).  So long as "fairminded jurists" could disagree on whether the state court correctly decided the matter, we may not grant relief.  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### A.        Ground One

Reed's Ground One claim largely reiterates his Ohio Court of Appeals argument that there was insufficient evidence to support any of his convictions.  *See* ECF Doc. 1 at 5; ECF Doc. 8 at 14–23.  Warden May responds that Reed's Ground One claim is noncognizable to the extent he challenges the manifest weight of the evidence and otherwise lacks merit.  ECF Doc. 6 at 16–22.[3]

In reviewing an insufficient evidence claim, federal courts apply the *Jackson v. Virginia* standard: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979) (emphasis in original).  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.*

---

[3] Although Reed references both sufficiency and manifest weight of the evidence in his pro se petition, I read his petition, as clarified by his counseled traverse, as only asserting a claim that the evidence presented at trial was insufficient to support his convictions.  *Jackson v. Noble*, No. 3:18-cv-113, 2020 U.S. Dist. LEXIS 250037, at *10–11 (N.D. Ohio Sept. 15, 2020) (collecting cases recognizing that manifest weight of the evidence claims are not cognizable on federal habeas review, whereas sufficiency of the evidence claims are).

at 324 n.16.  The reviewing court may "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [trier of fact]."  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  And when a state court has addressed the issue of sufficiency on the merits, the double layer of deference required by *Jackson* and AEDPA creates a "nearly insurmountable hurdle" for the petitioner.  *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (internal quotation marks omitted).

Reed has not shown that the Ohio Court of Appeals' rejection of his Ground One claim was contrary to, or an unreasonable application of, *Jackson*.  28 U.S.C. § 2254(d)(1).  Although the court did not cite *Jackson*, it applied state court precedent that was consistent with the *Jackson* standard.  *See* ECF Doc. 6-1 at 447–48 (quoting *State v. Williams*, 74 Ohio St.3d 569, 576 (Ohio1996)); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that a state court doesn't need to cite the applicable federal decision but need only apply a rule consistent with that opinion.  As will be discussed below, the court's decision also did not involve an unreasonable application of *Jackson* with respect to any of Reed's convictions.  28 U.S.C. § 2254(d)(1).

### 1.    Drug Offenses

Under Ohio law, "[n]o person shall knowingly obtain, possess, or use a controlled substance . . . .  Ohio Rev. Code § 2925.11(A).  Possession of drugs is aggravated when the drug involved is a schedule I or II controlled substance, such as fentanyl.  Ohio Rev. Code § 2925.11(C)(1)(a).  Similarly, no person may knowingly "[s]ell or offer to sell a controlled substance" or "[p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance."  Ohio Rev. Code § 2925.03(A)(1)-(2).  And no person shall aid or abet another in violating Ohio law.  Ohio Rev. Code § 2923.03(A)(2).

21

### a.    First Indictment

As to the drug offenses in the first indictment, the Ohio Court of Appeals determined that the evidence presented at trial demonstrated that: Reed sold drugs to CI-2 in the presence of a juvenile; Reed lived at the Townsend residence at the time of the controlled buys and execution of the search warrant; and contraband and drug paraphernalia was found in Reed's bedroom. ECF Doc. 6-1 at 449–50.  Reasonable jurists could disagree on the correctness of that determination. *Harrington*, 562 U.S. at 101.

Count Three of the first indictment concerned Reed's sale of heroin to CI-2 on December 8, 2014.  CI-2 testified that when she called to arrange the heroin purchase, Reed told CI-2 to come to the Townsend residence, where Reed lived and from where C-2 had previously purchased drugs.  ECF Doc. 6-8 at 170–74.  There, CI-2 testified that she received suspected drugs from Reed in exchange for the buy money while a person appearing to be five years old was present in the house.  ECF Doc. 6-8 at 176.  The jury had the benefit of listening to the recording of the December 8, 2014 controlled buy.  ECF Doc. 6-6 at 85–86, 92–95; ECF Doc. 6-8 at 171–72, 178–80.  And the jury received evidence that the suspected drugs provided by CI-2 tested positive for .11 grams of heroin.  ECF Doc. 6-9 at 81.  Thus, it was not unreasonable for the state court to find that there was sufficient evidence to support Reed's conviction on Count Three.

Counts Four through Seven of the first indictment concerned the heroin and cocaine that was found at the Townsend residence during the execution of the search warrant.  This included 4.29 grams of heroin and 16.70 grams of cocaine found in the plastic bags Reed discarded as the officers entered the house.  ECF Doc. 6-6 at 100, 115–16, 118; ECF Doc. 6-9 at 88.  CI-2 testified that Reed resided at the Townsend address and that she had previously purchased drugs

from the residence.  ECF Doc. 6-8 at 174.  And Detective West testified to paperwork, identification documents, photographs, and clothing found in the Townsend residence from which the jury could likewise have found that Reed resided at the Townsend residence.  ECF Doc. 6-6 at 107–09, 112.

The jury also received evidence from which they could have concluded that Reed had prepared the heroin and cocaine for sale, including: (i) multiple cell phones; (ii) plastic bags; (iii) digital scales, including one in the bedroom with Reed's effects; (iv) a drug ledger; (v) the value of the drug amounts seized; (vi) and the number of persons observed entering and exiting the Townsend residence prior to the execution of the search warrant.  ECF Doc. 6-6 at 98–99, 107–11, 116, 170.  Detective West testified these were indicative of drug trafficking activity.  ECF Doc. 6-6 at 99, 120, 157, 171.  Although Reed was observed with another individual, Desmond Scott, at the time the officers entered the residence, the jury heard a jailhouse phone call recording in which Reed indicated Reed needed to apologize to Scott because "he had nothing to do with this."  ECF Doc. 6-6 at 100; ECF Doc. 6-10 at 100; ECF Doc. 6-11 at 29–30; *see* ECF Doc. 6-10 at 134.  Thus, it was not unreasonable for the state court to find that there was sufficient evidence to support Reed's convictions on Counts Four through Seven.

### b.    Second Indictment

As to the drug offenses in the second indictment, the Ohio Court of Appeals determined that the evidence presented at trial demonstrated that Reed lived at the Larchmont residence and that he constructively possessed the narcotics found on the roof of the garage.  ECF Doc. 6-1 at 449–51.  Reasonable jurists could disagree on the correctness of that determination.  *Harrington*, 562 U.S. at 101.

Count One of the second indictment concerned Reed's actions in aiding Wilson to traffic in heroin by way of CI-4.  Detective Rotuno testified that he observed: (i) CI-4 transport Wilson to the area of the Larchmont residence; (ii) Wilson walk through backyards to the rear of the Larchmont residence; (iii) Wilson exit the Larchmont residence and return to CI-4's car; and (iv) Detective Brotherton retrieve suspected narcotics from Wilson, which tested positive for 0.76 grams of heroin.  ECF Doc. 6-7 at 58–62, 65, 68, 72.  CI-4 testified that she observed Wilson provide suspected heroin from her pants to Detective Brotherton after Wilson returned from the Larchmont residence to get CI-4 a gram of heroin.  ECF Doc. 6-10 at 75, 82–85.  CI-4 testified that she observed Wilson put the suspected heroin in her pants after CI-4 picked Wilson up from the area of the Larchmont residence.  ECF Doc. 6-10 at 85.  The jury heard CI-4's recording of the controlled buy.  ECF Doc. 6-7 at 78, 80–81, 83–88, 92–99, 101–03; ECF Doc. 6-10 at 75–76.  And The jury heard evidence from which they could find that Reed resided at the Larchmont address, including: (i) pants and shoes the same size as those found in the Townsend residence; (ii) a receipt for a phone in Reed's name and which was seized from Reed's person; (iii) mail addressed to Reed; and (iv) a safe to which Reed had the key. ECF Doc. 6-7 at 230–33, 237–39, 241–42; ECF Doc. 6-8 at 6.  This also included evidence that Reed was arrested walking toward the same green pickup truck that was seen leaving the Larchmont residence with two occupants shortly before the search warrant was executed.  ECF Doc. 6-8 at 110–13, 210.  Thus, it was not unreasonable for the state court to find that there was sufficient evidence to support Reed's conviction on Count One.

Counts Two through Five of the second indictment concerned the heroin, cocaine, and fentanyl that was found at the Larchmont residence.  The drugs at issue were those found in the coffee mug in the roof of the garage, including 42.04 grams of heroin, less than 0.10 grams of

cocaine, and 4.14 grams of fentanyl.  ECF Doc. 6-8 at 32; ECF Doc. 6-9 at 104, 110–11; ECF

Doc. 6-10 at 25, 28.  As discussed above, there was sufficient evidence from which the jury

could have found that Reed lived at the Larchmont residence.  Those residents included Reed's

son, who was under the age of 18 and therefore a juvenile.  ECF Doc. 6-7 at 214–15; ECF Doc.

6-11 at 215–16.  Although the coffee mug containing the drugs was never seen in Reed's

possession, there was sufficient evidence to establish constructive possession, i.e.: circumstantial

evidence establishing that Reed exercised dominion and control over the mug in which the drugs

were found.  *State v. Wolery*, 46 Ohio St.2d 316, 332 (Ohio 1976); *State v. Trembly*, 738 N.E.2d

93, 98 (Ohio Ct. App. 2000).  This included: (i) drug scales that were found in the bedroom and

kitchen where documents addressed to Reed where also found; (ii) $3,920 in currency found in

the bedroom with the drug scales and documents addressed to Reed; (iii) CI-4's March 8, 2016

controlled buy; and (iv) Officer Brotherton's observation of the change in Reed's demeanor,

from confident to concern, after being informed that the fire department was coming with a

ladder.  ECF Doc. 6-7 at 222–23, 239–40; ECF Doc. 6-8 at 5, 11, 36.  Thus, it was not

unreasonable for the state court to conclude that, from this evidence, a rational trier of fact could

find Reed guilty of Counts Two through Five of the second indictment.

### 2. Firearm Offenses

Ohio law provides that a person who is under indictment for, or previously has been

convicted of, a felony drug offense shall not "knowingly acquire, have, carry, or use any

firearm."  Ohio Rev. Code § 2923.13(A)(3).

The Ohio Court of Appeals determined that Reed's statements regarding the antique rifle

and the location of the antique rifle and two handguns were sufficient to support his firearm-

related convictions.  ECF Doc. 6-1 at 451.  Reasonable jurists could disagree on the correctness

of that determination.  *Harrington*, 562 U.S. at 101.  The antique rifle which formed the basis of Count Eight of the first indictment was found underneath a mattress where Reed's social security card was also located.  ECF Doc. 6-6 at 107–08, 111.  And the rifle was found in the same bedroom as: (i) a pair of pants with Reed's identification; (ii) clothing of Reed's size; and (iii) paperwork with Reed's name.  ECF Doc. 6-6 at 108–09, 112.  Moreover, Reed stipulated to his disability status when he agreed he had prior convictions.  ECF Doc. 6-13 at 65–66.  It was not unreasonable for the state court to conclude that this evidence, when coupled with Reed's statement to Officer Schock identifying the rifle, was sufficient evidence from which a rational trier of fact could have found that Reed constructively possessed the rifle and guilty of Count Eight.  ECF Doc. 6-9 at 50–51.

The handguns which formed the basis of Counts Six and Seven of the second indictment were found laying against the wall opposite the bed in the room which also contained: (i) pants and shoes the same size as those found in the Townsend residence; (ii) a receipt for a phone in Reed's name and which was seized from Reed's person; (iii) mail addressed to Reed; and (iv) a safe to which Reed had the key.  ECF Doc. 6-7 at 230–33, 237–39, 241–42; ECF Doc. 6-8 at 6, 15.  Thus, it was not unreasonable for the state court to conclude that such evidence was sufficient to support Reed's conviction on Counts Six and Seven.

### 3.    Tampering with Evidence

Ohio's tampering with the evidence statute makes it unlawful for a person, knowing that an investigation is in progress or likely to be instituted, to "[a]lter, destroy, conceal, or remove any … thing, with the purpose to impair its … availability as evidence in such proceeding or investigation."  Ohio Rev. Code § 2921.12(A)(1).

The Ohio Court of Appeals determined that Reed's act of throwing the plastic bags containing heroin and cocaine under the dining table was sufficient to support his conviction on Count Nine of the first indictment.  ECF Doc. 6-1 at 450.  Although the court did not elaborate on its reasoning, there was a reasonable basis for its conclusion.  *Harrington*, 562 U.S. at 98. Detective West testified that after the officers knocked and announced themselves, but prior to their entry, they could hear movement towards the rear of the Townsend residence.  ECF Doc. 6-6 at 99–100.  Detective West testified that as he was entering, he saw Reed run towards the officers and "discard" plastic bags underneath the dining table.  ECF Doc. 6-6 at 100–01, 106. And Detective West testified that one of the reasons for the element of surprise in executing a search warrant is to ward off an attempt by the suspect to conceal drugs or dump drugs on the floor to reduce the total drug amount retrievable.  EFC Doc. 6-6 at 170–71.  Given the short time between the entry and Reed's act of throwing, the state court could reasonably have determined from the evidence that Reed: was aware that an investigation was likely to be instituted, attempted to conceal drugs, and did so for the purpose of impairment the potential availability of the bags as evidence.  *See State v. Moore*, No. 2001 CA 2, 2001 Ohio App. LEXIS 5456, at *7–9 (Ohio Ct. App. 2001) (holding that officer's testimony that defendant saw defendant throw a baggie into the grass was sufficient to sustain a tampering with the evidence charge); *State v. Turner*, No. 19751, 2000 Ohio App. LEXIS 3797, at *2–3, 6–7 (Ohio Ct. App. 2000) (holding that defendant's act of dropping white objects in full view of officers was sufficient to sustain tampering with the evidence charge); *but see State v. Delaney*, 2004-Ohio-4158, ¶7 (Ohio Ct. App. 2004) (holding that merely dropping a cellophane wrapper to the floor in full view of the officers, without an attempt instruction, was insufficient to sustain a tampering with the evidence charge); ECF Doc. 6-13 at 100 (jury instruction on attempt).

27

### 4.     Ground One Summary

Based on the foregoing, the state court's conclusion that there was sufficient evidence from which a rational trier of fact could have convicted Reed of Counts Three through Nine of the first indictment and Counts One through Seven of the second indictment was not so lacking ins justification that it was beyond any possibility for fair-minded disagreement.  *Harrington*, 562 U.S. at 101.  I recommend that Reed's Ground One claim be DENIED for lack of merit.

## B.     Ground Two

Reed's Ground Two also largely reiterates his Ohio Court of Appeals argument that his confrontation rights were violated by the admission of hearsay statements by nontestifying confidential informants through officer testimony.  *See* ECF Doc. 1 at 7; ECF Doc. 8 at 23–35. Reed's traverse emphasizes, in particular: Detective Brotherton's testimony that Wilson obtained the heroin from Reed; Detective Brotherton's testimony that Reed had been inside the Larchmont residence before he applied for the search warrant; Detective Brotherton's testimony connecting the southeast bedroom to Reed; and Detective Brotherton's testimony connecting Reed to the coffee mug on the roof.  *See* ECF Doc. 8 at 24–34.  Warden May responds that Reed's Ground Two claim is moot with respect to CI-1 and otherwise meritless.  ECF Doc. 6 at 23–30.

The Sixth Amendment proscribes the admission of out-of-court testimonial statements by a nontestifying witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).  A statement is testimonial when its primary purpose is to establish or prove past events of potential relevance to a later criminal prosecution.  *Ohio v. Clark*, 576 U.S. 237, 244 (2015).  For a

witness to be "unavailable," the prosecution must "have made a good-faith effort to obtain the [non-testifying witness's] presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968).

Statements admitted in violation of the Confrontation Clause are subject to harmless error review. *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988). Reversal is required only when the erroneous admission had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Walker v. Warden, Chillicothe Corr. Inst.*, No. 21-3197, 2022 U.S. App. LEXIS 28401, at *3–4 (6th Cir. Oct. 12, 2022) (unpublished) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). If the court "is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' the error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Grave doubt exists when "the matter is so evenly balanced that [the court] feels [it]self in virtual equipoise as to the harmlessness of the error." *Id.* at 435. Factors relevant to the harmless error analysis include: (i) "the importance of the witness' testimony in the prosecution's case;" (ii) "whether the testimony was cumulative;" (iii) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;" (iv) "the extent of cross-examination otherwise permitted;" and (v) "the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Although the Ohio Court of Appeals' rejection of Reed's Ground Three claim was arguably based on flawed reasoning, Reed has not established that a writ of habeas corpus is warranted with respect to his Ground Three claim.

1.    **CI-1**

The Ohio Court of Appeals first considered Reed's challenge to the admission of CI-1's statements regarding the controlled buys which took place in October and November 2014. Before analyzing the propriety of that analysis, it is necessary to address Warden May's assertion that Reed's Ground One claim is moot as to those statements; the claim is *not* moot. Although the court vacated the trafficking in counterfeit controlled substance convictions, which stemmed from CI-1's controlled buys, the evidence relevant to those convictions was also relevant to the remaining counts arising out of events which took place inside the Townsend residence. For example, evidence that Reed was observed exiting the Townsend residence and interacting with CI-1 subsequent to a call from CI-1 to purchase drugs made it more likely that Reed sold drugs, resided at the Townsend residence, and potentially had drugs inside the Townsend residence. Thus, the potential impact of a constitutional violation stemming from the admission of CI-1's out-of-court statements cannot be isolated to Reed's vacated convictions.

As to the Ohio Court of Appeals' handling of Reed's Ground One claim, the court accurately articulated the *Crawford* standard and concluded that no Confrontation Clause violation occurred, because CI-1 was unavailable and the recordings that were played for the jury were offered to provide context and not for their truth. ECF Doc. 6-1 at 445–46. The latter conclusion, which Reed has not contested, was consistent with *Crawford* in that the recordings were played to give context to Detectives West's and Huffman's testimony of what they observed during the controlled buys. *See United States v. Sexton*, 119 F. App'x 735, 743 (6th Cir. 2005) ("When an out-of-court statement is not offered to prove the truth of the matter asserted . . . the Confrontation Clause is not implicated."). However, the Ohio Court Appeals' analysis of the testimony of what CI-1 said was incomplete. Although the court addressed

30

unavailability, the court did not address whether Reed had a prior opportunity to cross-examine CI-1. *See Crawford*, 541 U.S. at 59. And there is no indication on the available record that Reed had any such opportunity.

Nevertheless, any constitutional error in the admission of CI-1's statements through Detectives West and Huffman was harmless. *Brecht*, 507 U.S. at 623. The relevance of CI-1's statements primarily concerned Reed's drug activities in the Townsend residence. However, the other evidence implicating Reed in the sale of drugs from the Townsend residence was such that CI-1's out-of-court statements did not have a substantial and injurious effect on the jury's verdict on the remaining counts. Such evidence included CI-2's testimony that: (i) she previously purchased drugs at the Townsend residence; (ii) Reed was a source of drugs; (iii) Reed's nickname was "Bunny"; (iv) it was Reed's voice on the recorded phone call; and (v) Reed resided at the Townsend residence. ECF Doc. 6-8 at 167–68, 171, 173–76, 179. The jury also heard Detective West's testimony identifying items and drug paraphernalia located inside the Townsend address, from which the jury could also find that Reed resided and engaged in drug trafficking activities at the Townsend residence. ECF Doc. 6-6 at 98–99, 107–12, 116, 120, 157, 170–71. Thus, any Confrontation Clause violation stemming from the admission of CI-1's out-of-court statements was harmless.

### 2. Candace Wilson

The Ohio Court of Appeals found no basis for reversal on account of the admission of Wilson's out-of-court statements implicating Reed as the person from whom she purchased suspected heroin on March 8, 2016. ECF Doc. 6-1 at 446–47. The court reasoned, first, that Wilson's statements were admissible as statements by a party opponent. *Id.* Although not clearly articulated, the court also appeared to conclude that no prejudice resulted. *See id*.

Although the first finding arguably involved an unreasonable application of clearly established federal law, the latter did not. 28 U.S.C. § 2254(d)(1).

Statements made by a party opponent generally do not implicate the Confrontation Clause because such statements are by definition not hearsay. *Craig v. Winn*, No. 20-1844, 2021 U.S. App. LEXIS 15163, at *10 (6th Cir. May 20, 2021) (unreported). And deference must be given to a state court's determination that certain evidence is admissible under state law. *Miskel v. Karnes*, 397 F.3d 446, 452–53 (6th Cir. 2005). However, out-of-court statements by an accomplice or codefendant are treated differently under the Supreme Court's Confrontation Clause jurisprudence. *See Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that the introduction of a codefendant's inculpatory out-of-court statement violated the Sixth Amendment). "The rule of *Bruton* makes clear that the protections of the Confrontation Clause are at their zenith whenever the prosecution offers into evidence a non-testifying hearsay declarant's confession that names the accused as [her] partner in crime." *Peak v. Webb*, 673 F.3d 465, 478 (6th Cir. 2012) (alteration and internal quotation marks omitted). The Ohio Court of Appeals' first reason therefore arguably involved an unreasonable application of clearly established federal law regarding the Confrontation Clause.

However, the Ohio Court of Appeals' determination that no prejudice resulted from the admission of Wilson's out-of-court testimonial statements did not involve an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The relevance of Wilson's out-of-court testimonial statements was to establish that Wilson obtained drugs from the Larchmont residence and that Reed was the source of those drugs. It was not unreasonable for the court to conclude that there was sufficient other admissible evidence presented at trial from which the jury could make the same findings beyond a reasonable doubt, thereby rendering

32

any Confrontation Clause violation harmless.  CI-4 testified that: (i) she knew Reed prior to the controlled buys; (ii) she drove Wilson to and picked Wilson up from the vicinity of the Larchmont residence for the purpose of obtaining drugs; (iii) she observed Wilson place something in her crotch area; and (iv) she observed Wilson hand that same item to Detective Brotherton.  ECF Doc. 6-10 at 69, 73, 75, 82–85.  Detective Rotuno testified that he observed: (i) CI-4 drive Wilson to the vicinity of the Larchmont residence; (ii) Wilson walk through backyards towards the Larchmont residence; (iii) Wilson exit the Larchmont residence; and (iv) Wilson provide Detective Brotherton an item from her crotch.  ECF Doc. 6-7 at 59–62, 65, 68. The jury heard the recording of what Wilson told CI-4 and what CI-4 could hear from the phone call she received from Wilson.[4]  *See* ECF Doc. 6-6 at 78, 81, 83–88, 92–99, 101–02.  CI-4 identified Wilson's voice.  *See* ECF Doc. 6-10 at 76.  CI-2 had previously identified Reed's voice.  ECF Doc. 6-8 at 179.  And as discussed above, the jury heard evidence from which it could find that Reed resided at and sold drugs from the Larchmont address.  *See* ECF Doc. 6-7 at 222–23, 230–33, 237–42; ECF Doc. 6-8 at 5–6, 11, 36.  The state court's determination that Reed suffered no prejudice on account of the admission of Wilson's out-of-court testimonial statements was a conclusion on which fairminded jurists could disagree, thereby precluding federal habeas relief.  *See Harrington*, 562 U.S. at 101.

### 3. Gutter

Finally, the Ohio Court of Appeals determined that the trial court's limiting instruction on the use of hearsay was sufficient to cure the admission of Detective Brotherton's testimony that,

---

[4] Wilson's statements in the recording prior to Detective Brotherton's intervention are non-testimonial, as Wilson was unaware at that time of CI-4's involvement with police.  *See United States v. Ledbetter*, 117 F. Supp.3d 1042, 1060 (S.D. Ohio 2015) ("Whe[n] . . . the declarant makes unwitting statements to a confidential informant, those statements are not "testimonial" within the meaning of *Crawford*'s Confrontation Clause rubric.").

according to a nontestifying source, Reed hid drugs in several locations, including inside the garage, and that Reed had recently been robbed.  ECF Doc. 6-1 at 447.  That conclusion did not involve an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1); *Brecht*, 507 U.S. at 623.  Limiting instructions are among the measures a court can take to ensure that out-of-court statements do not implicate the Confrontation Clause.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  Immediately after Detective Brotherton testified to the out-of-court statements, the trial court instructed the jury not to consider them for the truth of the matter asserted but only to explain the detective's conduct.  ECF Doc. 6-8 at 34–35.  The jury is presumed to have followed those instructions.  *Richardson*, 481 U.S. at 211.  Thus, the state court's determination that Reed suffered no prejudice on account of the admission of Detective Brotherton's testimony regarding the anonymous informant was a conclusion on which fairminded jurists could disagree, thereby precluding federal habeas relief.  *See Harrington*, 562 U.S. at 101.

### 4.    Bedroom

In his traverse, Reed additionally challenges Detective Brotherton's testimony concerning Detaureis's out-of-court statements identifying Reed as the occupant of the southeast bedroom of the Larchmont residence.  ECF Doc. 8 at 29.  This issue was raised on direct appeal, but the Ohio Court of Appeals did not address it or else explain the basis for why the argument was rejected.  ECF Doc. 6-1 at 339, 447.  Nevertheless, deference is owed to the court's unexplained ruling.  *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009).  The state court reasonably could have determined that Reed suffered no prejudice on account of Detaureis's out-of-court statement, given the other evidence connecting Reed to the southeast bedroom.  *Brecht*, 507 U.S. at 623.  This included: (i) pants and shoes the same size as those found in the Townsend residence; (ii) a

receipt for a phone in Reed's name and which was seized from Reed's person; (iii) mail addressed to Reed; and (iv) a safe to which Reed had the key. ECF Doc. 6-7 at 230–33, 237–39, 241–42; ECF Doc. 6-8 at 6. Because there was a reasonable basis for the state court's rejection of Reed's challenge to the admission of Detaureis's out-of-court statement, the state court's ruling did not involve an unreasonable application of clearly established federal law. *Harrington*, 562 U.S. at 98.[5]

### 5. Ground Two Summary

Although the Ohio Court of Appeals' rejection of Reed's Ground Two claim was flawed in some respects, I find no basis for granting Reed's petition with respect to his Ground Two claim and recommend that it be DENIED for lack of merit.

### C. Ground Three

Reed's Ground Three claim argues that his due process rights were denied when the trial court conducted a joint trial on the charges in his two indictments. ECF Doc. 1 at 8; ECF Doc. 8 at 35–37. Warden Reed responds that Reed's Ground Three claim lacks merit. ECF Doc. 6 at 30–34.

There is no clearly established federal law which makes improper joinder or the denial of a motion to sever a constitutional violation. *Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013). In the context of joinder and severance under the Federal Rules of Criminal Procedure, the Supreme Court has stated: "Improper joinder does not, in itself, violate the

---

[5] Also, Reed's traverse raises for the first time a Confrontation Clause challenge to Detective Brotherton's testimony of why Detectives Rotuno and Roesch left to the motel. ECF Doc. 8 at 33; ECF Doc. 6-7 at 212. Reed's pro se petition cannot be liberally construed to have raised the issue because he did not argue to the Ohio courts on direct review that such testimony violated his constitutional rights. *See* ECF Doc. 6-1 at 331–40, 418–26, 552–560. Thus, it need not be addressed. *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005). Moreover, the issue is procedurally defaulted because it was not fairly presented to the Ohio courts on direct review, and any attempt to do so now would be barred by Ohio's res judicata doctrine. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009).

Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).  However, the Sixth Circuit has held that statement was mere *dicta* and, therefore, "does not constitute clearly established federal law for § 2254(d) purposes." *Tighe v. Berghuis*, No. 16-2435, 2017 U.S. App. LEXIS 28264, at *6 (6th Cir. Apr. 21, 2017) (unreported) (citing *Mayfield v. Morrow*, 528 F. App'x 538, 541–42 (6th Cir. 2013)); *see also Elatrache v. Jackson*, No. 20-1881, 2020 U.S. App. LEXIS 40309, at *12 (6th Cir. Dec. 23, 2020) (unreported).

Because there is no Supreme Court precedent that the state court's decision to conduct a single trial could be deemed contrary to, Reed cannot satisfy § 2254(d)(1).  *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020).  I recommend that Reed's Ground Three claim be DENIED for lack of merit.  *Cf.*, *e.g.*, *Alexander v. Winn*, No. 14-CV-13430, 2022 U.S. Dist. LEXIS 152529, at *22 (E.D. Mich. Aug. 24, 2022); *Alexander v. Harris*, No. 1:19-CV-00234, 2022 U.S. Dist. LEXIS 60882, at *26–27 (N.D. Ohio Feb. 18, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 60645 (N.D. Ohio Mar. 31, 2022); *McKnight v. Bobby*, No. 2:09-cv-059, 2020 U.S. Dist. LEXIS 167318, at *65 (S.D. Ohio Sept. 14, 2020).

### D.    Ground Four

Reed's Ground Four claim argues that his Fourth Amendment rights were violated when the trial court denied his motions to suppress.  ECF Doc. 1 at 10.  Warden May responds that Reed's Ground Four claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976), because he had a full and fair opportunity to litigate the issue in state court.  ECF Doc. 6 at 34–37.  In his traverse, Reed argues that he had no such opportunity, because the Ohio Court of Appeals undermined its own review of the Fourth Amendment issues when, despite the lack of evidence that he offered

36

to sell or sold anything to CI-1, it found that there was insufficient evidence that he knew he was selling a counterfeit drug yet failed to revisit the suppression issues.  ECF Doc. 1 at 11; ECF Doc. 8 at 37–40.

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend IV.  To secure that right, defendants facing criminal charges can move to suppress evidence obtained in violation of the Fourth Amendment, including evidence obtained from an improperly issued warrant.  *Stone*, 428 U.S. at 482–83.  However, when a defendant has had a full and fair opportunity to litigate a Fourth Amendment claim in state court, a federal court cannot grant a writ of habeas corpus on the basis that evidence obtained as a result of an unconstitutional search and seizure was presented at trial.  *Id.* at 494.  The *Stone* rule applies when: (i) the state provides a mechanism by which a criminal defendant can raise a Fourth Amendment claim; and (ii) the presentation of the Fourth Amendment claim before the court was not frustrated by a failure of that mechanism.  *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982).  The focus of this inquiry is on the availability of an avenue by which a defendant may present his claim in state court, not the adequacy of the procedure actually used.  *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013).

Reed's Ground Four claim is barred by *Stone*.  Ohio provides defendants in criminal cases both the opportunity to move to suppress evidence obtained in violation of the Fourth Amendment and also the right to appeal a trial court's denial of a motion to suppress.  *Riley*, 674 F.2d at 526 (citing Ohio Crim. R. 12; Ohio App. R. 3(A); Ohio App. R. 5(A)).  The Sixth Circuit has held this to be "an adequate procedural mechanism for the litigation of [F]ourth [A]mendment claims because the state affords a litigant an opportunity to raise his claims in a fact-finding hearing and on direct appeal of an unfavorable decision."  *Id.*

Reed's ability to raise his Fourth Amendment claims was not frustrated.  Reed filed motions to suppress the December 11, 2014 and March 15, 2016 search warrants; the trial court held hearings on each motion; and the court denied the motions.  *See* ECF Doc. 6-1 at 14–20, 45, 59–67, 97–102; ECF Doc. 6-2; ECF Doc. 6-3; ECF Doc. 6-4.  Reed then raised his Fourth Amendment Claims on direct appeal to the Ohio Court of Appeals, which overruled his suppression-related assignments of error and affirmed the trial court's rulings.  ECF Doc. 6-1 at 312–31, 441–44.  Reed argues that the Ohio Court of Appeals should have made different findings when it evaluated his sufficiency and manifest weight assignment of error and that, had those different findings been made, the court should then have revisited Reed's suppression-related assignments of error.  *See* ECF Doc. 8 at 37–40.  However, Reed's argument conflates *how* the state courts ruled with the *availability* of procedures by which Reed could litigate his Fourth Amendment claims in the state courts.  *See Fulcher v. Logan Cnty. Cir. Ct.*, 459 F. App'x 516, 520 (6th Cir. 2012) ("In performing [the *Stone*] analysis, we do not review the "correctness" of the state court decision."). There was a procedure available to Reed, Reed utilized that procedure to present his Fourth Amendment claims, and the state courts rejected the claims on the merits.  "That suffices to preclude review of the claim through a habeas corpus petition under *Stone v. Powell*."  *Good*, 729 F.3d at 640.

I recommend that Reed's Ground Four claim be DISMISSED as non-cognizable.

## III.    Certificate of Appealability[6]

Under 28 U.S.C. § 2253(c)(1)(A), this court will grant a certificate of appealability ("COA") for an issue raised in a §2254 habeas petition only if the petitioner has made a

---

[6] In light of the requirement that the Court either grant or deny a certificate of appealability at the time of its adverse order, a recommendation regarding the certificate of appealability is included.  Rule 11(a), 28 U.S.C. foll. § 2254.

substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

If the Court accepts my recommendations, Reed will not be able to show that the Court's rulings on his claims for relief in Ground One, Ground Three, and Ground Four are debatable among jurists of reason. Reed's claims for relief in Ground One and Ground Three are meritless. And his Ground Four claim is noncognizable. Thus, I recommend that no COA issue as to these claims.

However, because the availability of relief on Reed's Ground Two claim turns on whether he was prejudiced by any Confrontation Clause violation, I recommend that a COA be granted on the following issue:

> Did the admission of CI-1's, Candace Wilson's, Detaureis Reed's, and the non-testifying source's statements in violation of the Confrontation Clause have a substantial and injurious effect or influence in determining the jury's verdict?

## IV.    Recommendation

Because Reed's claims are meritless and noncognizable, I recommend that Reed's clams be DENIED in part and DISMISSED in part and that his petition for a writ of habeas corpus be DENIED.  I further recommend that Reed be granted a COA as to whether he was prejudiced by any Confrontation Clause violation in the admission of CI-1's, Wilson's, Detaureis's, and the non-testifying source's out-of-court statements.

Dated: March 21, 2023

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).